

AO 91 (Rev. 11/11) Criminal Complaint                                   AUSA Andrew C. Erskine (312) 353-1875

FILED
9/22/2021
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA

      v.

MIGUEL SALINAS SALCEDO,
    also known as "JORGE SALAS"

CASE NUMBER: 21 CR 591
**UNDER SEAL**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Beginning no later than in or about April 2019 and continuing until at least on or about October 28, 2020, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code, Section 1956(h) | conspiracy to commit offenses in violation of Title 18, United States Code, Section 1956, that is to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is the felonious buying and selling and otherwise dealing in a controlled substance, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control, of the proceeds of said specified unlawful activity and that while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

_____
CAROLYN WORKING
Special Agent, Homeland Security Investigations
(HSI)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: <u>September 22, 2021</u>

                                                *Judge's signature*

City and state: <u>Chicago, Illinois</u>        YOUNG B. KIM, U.S. Magistrate Judge
                                                    *Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## <u>AFFIDAVIT</u>

I, CAROLYN WORKING, being duly sworn, state as follows:

1.      I am a Special Agent with the Homeland Security Investigations ("HSI") and have been so employed since approximately 2019. I am currently assigned to U.S. Department of Homeland Security, Homeland Security Investigations, Chicago Financial Investigations Group (HSI Chicago FIG), and my responsibilities include the investigation of narcotics trafficking offenses.  As part of my duties, I investigate criminal violations relating to narcotics trafficking, money laundering, and money transmitting offenses, including violations of Title 21, United States Code, Sections 841 and 846; and Title 18, United States Code, Sections 1956(h) and 1960.  I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage, and importation of controlled substances and the further laundering of proceeds of narcotics smuggling and trafficking.  I have received training in narcotics investigations, money laundering, financial investigations, and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises.   I have participated in investigations involving violations of narcotics laws.  I have also participated in investigations that have led to the issuance of warrants involving violations of narcotic laws.

2.     I am an "investigative or law enforcement officer" within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.  I have participated in numerous drug-trafficking and money-laundering investigations involving various investigative techniques, including physical and electronic surveillance, the use of cooperating witnesses and informants, video, and visual surveillance, questioning of witnesses, controlled deliveries of narcotics, obtaining and analyzing a wide variety of records and data (including pen register and trap and trace data and cell phone location data), and tracing drug proceeds.  I have also been involved in the execution of numerous search warrants, arrests, and consent searches related to violations of federal law.  These investigative actions have covered the searches of locations such as vehicles, residences, and businesses.  Evidence recovered in these searches has included multi-kilogram quantities of marijuana, drug ledgers, large quantities of United States currency, drug packaging and paraphernalia, and other evidence.  I have participated in the debriefing and questioning of numerous defendants, witnesses, informants, and others who have knowledge of narcotics trafficking, and of the laundering and concealing of proceeds of drug trafficking.

3.     I have participated in investigations involving consensually recorded telephone and in-person conversations involving informants and cooperating defendants.  I have participated in the analysis and targeting of telephone numbers used in furtherance of drug trafficking and money laundering operations.

4. My descriptions of conversations in this affidavit are non-final summaries based on my review of draft transcripts of the recordings and my understanding of the context of the conversations. Those descriptions are not based on final, verbatim transcripts, and the times listed for the conversations are approximate. I have summarized conversations based, in part, on a preliminary review of draft transcripts of translated conversations, with my understandings in brackets based on my training and experience and the investigation to date. Spanish-to-English translations are non-final drafts. Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in the recorded conversations, and I have not included all of the facts known to me or other law enforcement officers about the investigation.

## Purpose and Basis of Affidavit

5. This affidavit is submitted in support of a criminal complaint alleging that MIGUEL SALINAS SALCEDO, also known as JORGE SALAS, has violated Title 18, United States Code, Section 1956(h). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging SALINAS SALCEDO with money-laundering conspiracy, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

6. The information set forth in this Affidavit is based upon my participation in this investigation, interviews of witnesses, information received from other law enforcement agents, review of documents, emails, text messages and my experience and training. All calls were recorded.

## Background on Money Laundering and Drug Trafficking

7. Based on my training and experience, I know the following information about international money laundering and the Black-Market Peso Exchange: Colombia is one of the world's primary sources of cocaine and heroin. There are numerous Money Laundering and Drug Trafficking Organizations (MLDTO) operating in Mexico. Examples of some of these MLDTOs are the Sinaloa Cartel, La Familia Cartel, Knights Templar Cartel, Juarez Cartel and Gulf Cartel. As a general rule, these Mexico-based MLDTOs purchase South American processed cocaine which is transshipped through Mexico and smuggled into the United States. These MLDTOs also grow, cultivate, cook, and process heroin, methamphetamines and marijuana in Mexico and subsequently smuggle the controlled substances into the United States for resale. The sale of these controlled substances generates substantial cash flow for the MLDTOs which represent the cost of goods sold and illegal profits.

8. Each year, MLDTOs generate billions of dollars of narcotics proceeds. In the United States, these narcotics are sold for dollars, almost always in cash, and often in small denominations. To profit effectively from this illegal activity, MLDTOs must find a way to "launder" these vast sums of cash, that is, to have the funds

transferred to a place and in a form that the narcotics traffickers can use them and in a manner that avoids detection by law enforcement.

9.     Banking laws in the United States, Colombia, and Mexico prevent narcotics traffickers from simply depositing the funds into accounts in the United States and transferring them to Colombia, Mexico, or other countries. As a result, narcotics traffickers must disguise, or "launder", the funds in order to hide their true source.

10.     The Black-Market Peso Exchange (the "BMPE") is one of the primary methods used by MLDTOs to launder their proceeds. The basic BMPE scheme typically operates as described below.

11.     In Colombia or Mexico, a narcotics trafficker owning narcotics proceeds generated in the United States and elsewhere outside of Colombia or Mexico contacts a third party - generally referred to as a "peso broker" - who agrees to trade pesos he controls in Colombia or Mexico in exchange for the cash narcotics proceeds in the United States and elsewhere outside of Colombia or Mexico. Once this exchange occurs, the narcotics trafficker, having received pesos in Colombia or Mexico from the peso broker, has effectively laundered his money and is out of the BMPE process. The peso broker, on the other hand, must now do something with the drug dollars that he has acquired outside of Colombia or Mexico so that he can obtain more pesos to begin the BMPE process again.

12.     To do so, the peso broker uses contacts in the United States and elsewhere outside of Colombia or Mexico to receive the drug proceeds purchased from

the narcotics trafficker, often arranging for criminal associates to receive the drug proceeds in suitcases or bags from operatives who control the narcotics trafficker's money. After the money is physically transferred, the peso broker uses additional contacts in the United States to get the drug proceeds into the United States banking system. To avoid detection, this is often done either through deposits into bank accounts in company names that are intended to appear to be related to legitimate business activity or through multiple deposits of small amounts of drug proceeds into different bank accounts which are then consolidated into larger accounts both in the United States and elsewhere outside of Colombia or Mexico. The peso broker, still operating in Colombia or Mexico, now has a pool of narcotics-derived proceeds in the United States to sell to individuals or companies in Colombia who desire United States dollars.

13. Persons in Colombia or Mexico, either individuals or companies, who have pesos to sell—whether from legitimate sources or not—and who want to exchange pesos for dollars in a manner that avoids Colombian or Mexican currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the government, then make arrangements with the peso broker. In an effort to conceal the true nature of these transactions, dealings between the dollar purchaser and the peso broker are almost always based only on verbal agreements and conducted without any paperwork. As a result, these transactions enable Colombians and Mexicans to avoid currency exchange and income reporting requirements and the payment of taxes, tariffs, and duties owed to the government.

Once the transaction is complete, the peso broker then uses his contacts in the United States and elsewhere outside Colombia or Mexico to transfer the drug proceeds he has accumulated from the narcotics trafficker to wherever the dollar purchasers ask for them to be transferred. Therefore, under the BMPE system, the drug proceeds can and often do end up in the accounts of individuals or companies who appear to have no direct involvement in narcotic-trafficking crimes.

14.     All three parties involved in the BPME process benefit: (a) the MLDTO receives laundered pesos; (b) the dollar purchaser evades United States and Colombian/Mexican currency exchange and income reporting requirements, and the payment of taxes, tariffs, or duties owed to the government; and (c) the peso broker makes a profit from the commissions retained during the unofficial currency exchange process. Meanwhile the BMPE process frustrates the efforts of the United States, Colombia, Mexico, and other governments around the world to enforce their currency exchange and income reporting requirements, to collect taxes, tariffs and duties owed to them, and to maintain the integrity of their financial institutions.

## Background on Investigation

15.     Since approximately April 2019, an HSI investigator working in an undercover capacity ("UC1") has been in communication with MIGUEL ANGEL SALINAS SALCEDO a/k/a. JORGE SALAS.[1] UC1 and SALINAS SALCEDO have

---

[1] SALINAS SALCEDO was introduced to UC1 as "JORGE SALAS." However, investigators subsequently identified him as MIGUEL ANGEL SALINAS SALCEDO as follows:

communicated numerous times, and UC1 recognizes SALINAS SALCEDO by voice.

Based on communications and work between SALINAS SALCEDO and UC1,

SALINAS SALCEDO has been identified as a Mexico-based money broker—that is,

---

On or about March 21, 2021, SALINAS SALCEDO told another undercover investigator (UC2) he would be traveling to "Angela" [Los Angeles] soon and would give UC2 a new phone number, which SALINAS SALCEDO did later the same day. According to records from AT&T, the phone from which SALINAS SALCEDO called had a subscriber address of a store in San Diego. On or about April 16, 2021, investigators received an image from the store of a male purchasing a pre-paid phone at the store around the time SALINAS SALCEDO's phone was activated (per AT&T records). The image showed a bald Hispanic male wearing a black face mask, red long-sleeve shirt, blue jeans, and sneakers.

On or about April 20, 2021, UC2 received a message from a new number stating, "Bro I'm this number [sic] for a few days". Based on further communications with this number, UC2 confirmed this was "JORGE SALAS"/SALINAS SALCEDO. According to records from AT&T, this second phone from which SALINAS SALCEDO called UC2 had a subscriber address of another store in San Diego. The subscriber was listed as "Daniel Salas." On April 21, 2021, investigators received images from the second store of a male purchasing a pre-paid phone at that store on or about April 20, 2021 at approximately 1:12 p.m. local time, around the time the second phone was activated (per AT&T records). The image showed a bald Hispanic male wearing a blue face mask, red long-sleeve shirt, black pants, and black sneakers.

A search of U.S. Customs and Border Protection border-crossing records for the days March 21, 2021, and April 20, 2021, revealed that a MIGUEL ANGEL SALINAS SALCEDO crossed through San Ysidro pedestrian lane on March 21, 2021 at approximately 1:50 p.m. local time and through Otay Mesa Cross Border Express on April 20, 2021 at approximately 11:15 a.m. The images of SALINAS SALCEDO's border crossing on March 21, 2021 were compared with the image from the first store, and the image of SALINAS SALCEDO's border crossing on April 20, 2021 was compared with the images from the second store. These images confirmed that it was the same individual.

According to CBP records, on or about September 13, 2021, SALINAS SALCEDO entered the United States from Mexico via Otay Mesa, which is near San Diego. On or about September 14, 2021, "SALAS"/SALINAS SALCEDO contacted UC2 and stated he was in San Diego and would be there for two weeks.

someone who contracts with drug traffickers in Mexico to help repatriate cash drug proceeds located in the United States. Over the course of the investigation into SALINAS SALCEDO, UC1—posing as a U.S.-based money launderer—has accepted and filled approximately 22 money-laundering contracts offered by SALINAS SALCEDO totaling approximately $2,837,892 in cash. Each of these contracts was executed by UC1's representative (i.e., an undercover investigator) meeting with an unknown person (i.e., the money courier working on behalf of the owner of the money) in a public place for bulk cash to be discretely transferred. These "money pickups"— based on contracts offered by SALINAS SALCEDO—have been conducted in Chicago, Illinois; New York, New York; Cleveland, Ohio; Atlanta, Georgia; Kansas City, Missouri; Dallas, Texas; Baltimore, Maryland and has been offered contracts in Los Angeles, California; Seattle, Washington, Boston, Massachusetts; Greensboro, North Carolina; Miami, Florida; and Philadelphia, Pennsylvania; Louisville, Kentucky; Houston, Texas; Detroit, Michigan; Baltimore, Maryland and Orlando, Florida. After receiving the bulk cash, investigators completed the contracts by transferring the funds to bank accounts as directed by the owner of the money (as relayed by SALINAS SALCEDO).

16. One of these contracts brokered by SALINAS SALCEDO led to the seizure of six kilograms of cocaine and approximately $586,220 in or about May 2019 in Winston Salem, North Carolina, when the courier was intercepted by law enforcement (prior to the money-transfer meeting), and approximately $393,000 was recovered from the courier's vehicle. Further, approximately $191,325, and about six

kilograms of cocaine was seized pursuant to a search warrant executed at the residence the courier was seen departing. Likewise, in relation to other money pickups brokered by SALINAS SALCEDO, in Kansas City, Missouri, in or about June 2020, law enforcement seized approximately $290,960 from the courier and in Chicago, Illinois, in or about August 2020, law enforcement seized approximately $332,750 from two separate couriers.

17.     Based on the drug seizures described above, and on additional evidence detailed below, as well as based on my training and experience, I believe the money involved in SALINAS SALCEDO's contracts constitute drug proceeds.

18.     As noted, a number of the money contracts offered to UC1 by SALINAS SALCEDO were in Chicago. Five of the these Chicago-based "money pickups" are detailed below.

### May 1, 2020, Money Pickup

19.     On or about April 23, 2020, UC1 was contacted by SALINAS SALCEDO who requested UC1's assistance with a money pickup of "200" [$200,000] in Chicago. SALINAS SALCEDO requested a series [dollar-bill serial number], and UC1 provided SALINAS SALCEDO a phone number of a courier in Chicago [to receive the cash] as well as the serial number of a one-dollar bill. In addition, UC1 provided the verbal code "de parte de Emiliano" [on behalf of Emiliano]. The phone number provided to SALINAS SALCEDO belonged to another undercover investigator who was posing as a money courier in Chicago ("UC2").

20.     Based on my training and experience, and my communications with my fellow investigators, I know that individuals participating in the transfer of bulk cash drug proceeds often make use of a dollar bill and its serial number and a verbal code in order to verify that the correct couriers are meeting and are correctly transferring the proceeds. If a party is not able to produce the bill bearing the serial number or the verbal code, the cash transfer does not take place. I am further aware that information about the serial number on the dollar bill is commonly communicated by cell phone from the money courier holding the dollar bill to the money broker coordinating the transaction (or another person who is in contact with such a money broker).

21.     On or about April 27, 2020, UC1 inquired about the status of the Chicago money pickup and SALINAS SALCEDO stated he would check. On or about April 28, 2020, SALINAS SALCEDO asked UC1 if he/she had heard anything in "the wind" [Chicago]. UC1 responded "no" and asked if SALINAS SALCEDO was told they [Chicago courier] had called. SALINAS SALCEDO informed UC1 he hadn't heard anything and would call [the client] to see what was going on. At approximately 3:07 p.m. SALINAS SALCEDO forwarded a message to UC1 from an unknown third party which said "They will call you for sure. They said they are almost at 200 [$200,000]. That's how the fuckers are there."

22.     On or about April 29, 2020, SALINAS SALCEDO informed UC1 that a call should be received in Chicago that day. SALINAS SALCEDO explained the

Chicago clients had been still putting the money together but were supposed to be done that day.

23. On or about April 30, 2020, UC1 asked SALINAS SALCEDO if the Chicago contract fell through. SALINAS SALCEDO responded stating the Chicago clients would be calling that day to deliver 72 [$72,000] in the meantime.

24. On or about April 30, 2020, at approximately 8:01 p.m., UC2 received a phone call from an unknown male ("MONEY COURIER 1"). After the codes above-described codes were exchanged, MONEY COURIER 1 and UC2 agreed to meet the following day.

25. On or about May 1, 2020, at approximately 11:47 a.m. UC2 received a call from MONEY COURIER 1 and the two agreed to meet at a store in Lansing, Illinois, later that day.

26. On or about May 1, 2020, UC1 informed SALINAS SALCEDO that the parties in Chicago were supposed to meet that afternoon. UC1 asked if SALINAS SALCEDO wanted the funds to go to an account SALINAS SALCEDO had previously used, and SALINAS SALCEDO stated he would let UC1 know. Later that day, SALINAS SALCEDO provided UC1 with instructions to wire the funds, less 2.5%. UC1 asked whether SALINAS SALCEDO meant less 1.5% [UC1's commission] but SALINAS SALCEDO explained UC1 should also hold SALINAS SALCEDO's commission, and they could figure out how to get the remainder to SALINAS SALCEDO later.

27.     On or about May 1, 2020, at approximately 2:22 p.m., UC2 received a call from MONEY COURIER 1 requesting UC2's exact location. Moments later, MONEY COURIER 1 arrived and parked next to UC2's vehicle. After exchanging greetings, UC2 provided the dollar bill (bearing the serial number that'd been passed to SALINAS SALCEDO) to MONEY COURIER 1. After confirming the amount, MONEY COURIER 1 retrieved a bucket from the rear of his truck bed, removed a green plastic bag from within the bucket and placed it on the ground in between the two vehicles. UC2 picked up the bag and placed it inside the undercover vehicle. UC2 confirmed the bag contained bulk U.S. currency and UC2 and MONEY COURIER 1 parted ways.

28.     On or about May 1, 2020, at approximately 2:36 p.m. SALINAS SALCEDO messaged UC1 stating he was notified the Chicago pickup had occurred. UC1 confirmed the pickup occurred and informed SALINAS SALCEDO the individual who delivered the funds said it was $70,500. UC1 told SALINAS SALCEDO the funds would be deposited the following day and UC1 would provide SALINAS SALCEDO the final count once the funds were deposited.

29.     On or about May 2, 2020, UC1 informed SALINAS SALCEDO the final count was $70,500 and provided SALINAS SALCEDO a wire receipt showing that a wire in the amount of $68,702.50 was sent as per SALINAS SALCEDO's instruction.

### July 27, 2020, Money Pickup

30.     On or about July 23, 2020, SALINAS SALCEDO contacted UC1 writing "Let's start off with 100 thousand. Request a token for Chicago." UC1 provided a

phone number of a supposed courier in Chicago ("UC3"), a dollar bill serial number, and the verbal code "de parte de Emiliano".

31.     On or about July 24, 2020, UC3 received a call from an unknown male (MONEY COURIER 2) and the two discussed talking on the following Sunday to confirm the meeting time and location for Monday July 27, 2020.

32.     On or about July 24, 2020, UC1 informed SALINAS SALCEDO that contact had been made in Chicago and the parties agreed to speak on Sunday to coordinate the pickup for Monday.

33.     On or about July 26, 2020, UC1 informed SALINAS SALCEDO that his people were not answering the phone and SALINAS SALCEDO texted "Let me call him, bro. I was just about to ask you."

34.     On or about July 26, 2020, at approximately 4:45 p.m., UC3 received a call from MONEY COURIER 2 and the two agreed to meet on Monday, July 27, 2020 at approximately 3:00 p.m.

35.     On or about July 27, 2020, SALINAS SALCEDO asked UC1 whether he/she knew if communications occurred. UC1 informed SALINAS SALCEDO that the parties had agreed to meet at 3:00 p.m.

36.     On or about July 27, 2020, at approximately 3:25 p.m., UC3 arrived at the agreed-upon gas station in Chicago and called MONEY COURIER 2 to provide his/her vehicle description. MONEY COURIER 2, in turn, provided his vehicle description and moments later MONEY COURIER 2 arrived near UC3, exited his vehicle carrying a small box and approached UC3's vehicle. MONEY COURIER 2

entered the undercover vehicle, UC3 provided him the serial number, and MONEY COURIER 2 confirmed the code using his cell phone. MONEY COURIER 2 then turned the box over to UC3 and UC3 confirmed the box contained bulk U.S. currency. MONEY COURIER 2 informed UC3 that he had counted it and provided a detailed count of each bundle, totaling $100,000. MONEY COURIER 2 then exited the undercover vehicle, returned to his vehicle, and departed.

37. On or about July 27, 2020, at approximately 3:36 p.m. SALINAS SALCEDO texted UC1 asking, "Did you hear anything about the pickup, bro?" UC1 informed SALINAS SALCEDO that the pickup had occurred and asked SALINAS SALCEDO where he wanted the money sent.

38. On or about July 28, 2020, SALINAS SALCEDO sent UC1 instructions for wiring the funds to multiple accounts, along with instructions about the amount to send to each account. SALINAS SALCEDO also texted UC1 "I also have to send them amount. They've been nagging and nagging since yesterday." UC1 provided the amount picked up and receipts from the wire transfers.

**August 4, 2020, Money Pickup**

39. As described below, in August 2020, SALINAS SALCEDO provided a contract to UC1 that was conducted by UC2. During the money pickup, as well as afterwards, UC2 offered to sell cocaine to the money courier. As a result, the owners of the money involved in the contract became upset with SALINAS SALCEDO [because the money courier attempted to steal their cocaine customer]. Accordingly, SALINAS SALCEDO complained to UC1.

40.     More specifically, on or about July 28, 2020, at approximately 5:33 p.m. SALINAS SALCEDO texted UC1 "Bro, can you ask [UC2] for another serial number? This one's for 80." UC1 provided SALINAS SALCEDO with a phone number, one dollar bill serial number and the verbal code "de parte de Emiliano."

41.     On or about August 3, 2020, at approximately 5:04 p.m., UC2 received a call from an unknown male (MONEY COURIER 3) who passed the verbal code and stated he needed to meet UC2 so he could "hand over a check" [deliver bulk cash]. UC2 asked MONEY COURIER 3 for "the numbers on the check" [the amount] and MONEY COURIER 3 stated "thirty-two" [$32,000]. UC2 told MONEY COURIER 3 "the party" [the amount] was supposed to be for one hundred fifty. MONEY COURIER 3 advised he would check and contact UC2 later.

42.     On or about August 3, 2020, at approximately 5:10 p.m. MONEY COURIER 3 called UC2 and said he needed to confirm the serial number on the one-dollar bill. MONEY COURIER 3 confirmed the amount would be 'thirty-two people' and MONEY COURIER 3 and UC2 confirmed the serial number. MONEY COURIER 3 and UC2 agreed to meet midday on August 4, 2020.

43.     On the same day, UC1 texted SALINAS SALCEDO asking about the amount. SALINAS SALCEDO replied "Bro, I already called. I'll explain what he said. He has one for 30 and another for 120 from two different people and an additional one for 40."

44.     On August 4, 2020, at approximately 11:14 a.m. MONEY COURIER 3 called UC2, and they agreed to meet at 1:00 p.m.

45.    On August 4, 2020, at approximately 11:22 a.m. MONEY COURIER 3 called UC2 and advised he was available to meet immediately. UC2 said he/she was busy, and it would be easier to keep the 1:00 p.m. time. MONEY COURIER 3 agreed and said that everything always appears so easy for the people down south [Mexico] and that he had similar conversations with someone else who does the same [money pickups], and they both have commented that sometimes those people [in Mexico] don't even have the tickets [bulk cash] collected and are already planning how to spend the money.

46.    On August 4, 2020, at approximately 12:14 p.m. UC2 gave MONEY COURIER 3 the address for a store in Countryside, Illinois, for the meeting.

47.    On August 4, 2020, at approximately 12:47 p.m. MONEY COURIER 3 called UC2 and asked if he/she had the one-dollar bill because "they" had told him only to give "it" [the drug proceeds] to UC2 if he/she has the dollar.

48.    On August 4, 2020, at approximately 1:07 p.m. MONEY COURIER 3 and UC2 made contact in a restaurant parking lot near the store. MONEY COURIER 3 entered UC2's vehicle carrying a blue and white plastic bag. Once the dollar bill was confirmed, MONEY COURIER 3 handed UC2 the bag. UC2 opened the bag, confirmed it contained bulk U.S. currency, and removed the bundles of currency so that MONEY COURIER 3 could see, then placed the currency back into the bag and opened an aftermarket hidden compartment (a "trap") located in the undercover vehicle. MONEY COURIER 3 appeared impressed by the compartment and immediately asked how much it cost. MONEY COURIER 3 told UC2 they have a guy

who comes from Mexico to install compartments, but he takes too long. UC2 told MONEY COURIER 3 the compartment could hold three million [dollars] along with about thirty kilos. MONEY COURIER 3 stated he wanted to remain in communication with UC2, exited the undercover vehicle, retrieved another cell phone from his vehicle and returned to the undercover vehicle. MONEY COURIER 3 provided UC2 this other phone number and the two conversed about the demands the people in Mexico have. UC2 mentioned that it was "dry" out there [no narcotics] and MONEY COURIER 3 agreed. MONEY COURIER 3 told UC2 that "they" have been telling him for months that something is coming, but it hasn't come. MONEY COURIER 3 also told UC2 that there is stuff here, but "they" are hoarding it and it is up there in price. UC2 asked MONEY COURIER 3 if he had one or two [kilograms] he/she could purchase to supply his/her customers and MONEY COURIER 3 laughed and said, "you took the words out of my mouth, I was gonna tell you that." UC2 asked MONEY COURIER 3 how many he would need, and MONEY COURIER 3 said he would like to see a sample first. UC2 asked MONEY COURIER 3 if he was looking for 'Chinese food' [heroin] or 'soda' [cocaine] and MONEY COURIER 3 said right now he was only interested in 'soda'. MONEY COURIER 3 asked UC2 for prices and a photo [sample], and the two agreed it would be best to start with one [kilogram] although MONEY COURIER 3 said if he like the quality he would want between ten and twenty [kilograms]. Prior to exiting the undercover vehicle, MONEY COURIER 3 requested to start with a photo [sample], and UC2 agreed.

49.     On or about August 6, 2020, at approximately 8:48 p.m. SALINAS SALCEDO sent wiring instructions to UC1 along with a text saying "Bro, help me send the 31 tomorrow. If you can do it early, I would appreciate it".

50.     On August 12, 2020, at approximately 7:13 p.m. UC2 placed a call to MONEY COURIER 3 and told him some 'stuff' [cocaine] was coming in and asked if MONEY COURIER 3 wanted to talk. MONEY COURIER 3 asked for the price on the 'tires' [cocaine] and they discussed price. UC2 advised MONEY COURIER 3 he/she would be sending a picture, and MONEY COURIER 3 said he would save UC2's number.

51.     On August 12, 2020, at approximately 7:21 p.m. UC2 sent MONEY COURIER 3 the following picture via text message:



52.     Continuing the same day, after some text messages about the price were exchanged, at approximately 12:17 p.m., UC2 called MONEY COURIER 3. MONEY

COURIER 3 advised that he only wanted one 'rim' [kilogram] at the moment, and his boss wanted him to make sure it 'fit on his truck' [was good quality]. If everything worked well, they could take more. MONEY COURIER 3 stated the buyer was very picky, to which UC2 replied that the person would probably be looking to 'cook it' and MONEY COURIER 3 agreed and asked if it was possible to do so. UC2 informed MONEY COURIER 3 that it was clean and untouched.

53. On or about September 3, 2020, at approximately 10:44 p.m. SALINAS SALCEDO sent UC1 a message stating, "Bro and I forgot to mention, but the people with this last serial number you sent for Chicago didn't call because you sent me the same number and the same name. We need to change numbers and codes because the people from the ranch are stuck in their ways, you know."

54. On or about September 6, 2020, beginning at approximately 11:20 a.m. SALINAS SALCEDO sent UC1 the following message: "Bro, whenever you can report to me, I need to talk to you. They [the owners of the drug proceeds delivered by MONEY COURIER 3] called me today so we could go have breakfast and they could talk to me because of a situation in Chicago. They didn't want to tell me why exactly they didn't send anything else." "What have you gotten me into? Here it looks like he's [UC2] offering drugs."

55. On the same day at 2:57 p.m., SALINAS SALCEDO forwarded UC1 audio messages from unknown Spanish-speaking males that, in summary, complained about UC2 attempting to provide "it" [cocaine] cheaper to MONEY COURIER 3, as well as noting cars following MONEY COURIER 3.

56.     SALINAS SALCEDO subsequently sent to UC1: "It seems weird to me because it was supposed to be [UC2], someone you trust a lot, but if they sent someone to call me so they can talk to me, then that looks like they're betraying us and aside from that they offered them drugs."

57.     On the same day at approximately 2:59 p.m. SALINAS SALCEDO sent UC1 the following image, which UC2 had send to MONEY COURIER 3:



58.     On the same day, beginning at approximately 3:00 p.m., SALINAS SALCEDO sent UC1 the following messages:

        a.      "There it is, so you can check it out, bro."

b.  "Please, bro. This situation is very delicate. It makes me look like I'm not serious, it makes me look bad and these people can give us lots of jobs, but not like this. That's why when I sent them the same number and the same reference, they didn't want to do anything anymore. And that man has nothing to do with drugs. He also confronted me about that, he asked who I was sending with."

59.  On the same day beginning at approximately 6:25 p.m. SALINAS SALCEDO sent UC1 the following: "But the betrayal part wasn't about you or me, it's about the client, bro. The one who sends me the jobs. He has a lot, but obviously he told me he wasn't going to do it this way. That he was going to stop doing business from one day to another. These people are betraying their clients." UC1 asked how to make amends with SALINAS SALCEDO's client and SALINAS SALCEDO replied, "Well first, I promised not to send anything to those same people, he doesn't want to know anything about it. So we need to be careful when it comes to the [phone] numbers and we need to change the reference [verbal codes]." SALINAS SALCEDO subsequently added, "And obviously, we have to make sure that this situation never happens again, bro. The middlemen should never mention anything, let alone when it comes to these drug topics. They should say: 'Call someone over there [Mexico]' or 'communicate with someone over there [Mexico]' at least. That's how it works over here." And later, "Let's hope it doesn't happen again. I don't think we could excuse it now".

**September 29, 2020, Money Pickup**

60.    On or about September 29, 2020, at approximately 10:19 a.m., UC1 was contacted by SALINAS SALCEDO for a $350,000 money pickup in Chicago. SALINAS SALCEDO texted: "Bro, good morning. Do you remember the last one for "Vientos" [Chicago], that they didn't call? They have already checked in and they are ready now and they gathered up more. Ask for the serial number, bro let's get it out this week." UC1 provided SALINAS SALCEDO a phone number for UC3 and serial number as well as the verbal code "De parte de Pelon".

61.    On or about September 29, 2020, at about 1:28 p.m., UC3 received a telephone call from an unknown male speaking in Spanish (MONEY COURIER 4). MONEY COURIER 4 provided UC3 the verbal code that had been agreed upon by UC1 and SALINAS SALCEDO, and proposed to meet later that day, which UC3 understood to mean for MONEY COURIER 4 to give the bulk cash to UC3.

62.    On or about September 29, 2020, at about 2:50 p.m., UC3 placed a telephone call to MONEY COURIER 4. UC3 proposed a location for the meeting. MONEY COURIER 4 stated he was instructed not to drive too far and would call UC3 back.

63.    On or about September 29, 2020, at about 2:55 p.m., UC3 received a telephone call from MONEY COURIER 4 agreeing to meet UC3 at a mall and proposing to meet between 4:30 p.m. and 4:45 p.m. that afternoon.

64.     On the same day, at about 1:18 p.m. SALINAS SALCEDO sent UC1 texts saying "They will meet over there shortly. They've got an appointment already." UC1 replied, "They did call and they agreed at 5:00 more or less."

65.     On or about September 29, 2020, at about 5:11 p.m., UC3 received a telephone call from MONEY COURIER 4, informing UC3 that he was around the mall. UC3 and MONEY COURIER 4 identified each other's vehicles and MONEY COURIER 4 entered the undercover vehicle. UC3 provided the dollar bill serial number to MONEY COURIER 4. MONEY COURIER 4 placed a phone call via Snap Chat to an unknown individual to confirm the serial number. Once confirmed, MONEY COURIER 4 instructed UC3 to sign the dollar bill. Once UC3 complied, MONEY COURIER 4 informed UC3 he was turning over $356,430. MONEY COURIER 4 stated he had personally marked the $10,000 bundles with the numbers 1-32 and a separate bundle containing $7,000. In addition, MONEY COURIER 4 explained there was a separate bag containing $29,430. MONEY COURIER 4 exited the undercover vehicle, walked back to his vehicle, and retrieved a large black duffle bag from the rear passenger side of his vehicle, which he placed on the front passenger seat of the undercover vehicle. UC3 opened the bag and observed numerous aluminum wrapped bundles in vacuum sealed plastic. MONEY COURIER 4 returned to his vehicle and departed.

66.     On the same day at approximately 5:31 p.m., SALINAS SALCEDO texted UC1, "A total of 356,430. They will be meeting shortly. That was half an hour

ago". At approximately 6:06 p.m. UC1 texted SALINAS SALCEDO, "Yes, confirmed" and SALINAS SALCEDO replied "Copy."

67.     On or about September 30, 2020, at approximately 8:51 a.m. SALINAS SALCEDO texted wiring instructions to UC1 stating "Bro, this one is only 99,978" and "I'll send you more transactions for the rest." At approximately 10:32 a.m., SALINAS SALCEDO texted UC1 instructions and "the rest of it for this one, bro please. But they didn't request a fixed price… one for 70 and some change and another for 60 and some change. I just made the request to you that it be a fixed price apart from the 99,978 that I had already asked you for." SALINAS SALCEDO then followed up with, "**for it NOT to be a fixed price". At approximately 12:46 p.m. SALINAS SALCEDO texted UC1, "Bro, there were some changes. I'll send you the way it will go, for sure sorry." And at approximately 1:14 p.m. "Let's pretend that they sent the 356,430 minus what's ours, there are 347,519 left minus the 99,000 from the [business account name] minus the 122,000. The [business account name] one will have 125,619 left. 125,619 for the [business account name] minus 90 for the 3 fees, a total of 125,529 to be sent, the total for the [business account name]. That's how it will go, bro."

68.     On the same day at approximately 5:38 p.m., SALINAS SALCEDO texted UC1, "Bro, do you have the paperwork? Help me out with that over here it's going to be 6 and you already know that I'll do the paperwork myself."

69.     On October 1, 2020, UC1 sent SALINAS SALCEDO the receipts of the wire transactions.

**October 22, 2020, Money Pickup**

70.     On or about October 21, 2020, at approximately 9:15 a.m., UC1 was contacted by SALINAS SALCEDO: "Good morning, bro. Can you help me out with a serial number for Chicago? They will send 170 brother." UC1 provided a phone number of a "courier" in Chicago (UC2), the serial number of a one-dollar bill and the verbal code "de parte de pelon".

71.     On or about October 21, 2020, at approximately 4:43 p.m., UC2 received a telephone call from an unknown male (MONEY COURIER 5), speaking in Spanish. MONEY COURIER 5 passed the verbal code and informed UC2 that his driver would be delivering the money and that he would have his driver contact UC2 directly. Later that day at approximately 5:30 p.m., UC2 received a telephone call from another unknown male (MONEY COURIER 6), speaking Spanish, who also passed the verbal code. UC2 asked MONEY COURIER 6 to meet him the next day at a mall at noon. MONEY COURIER 6 stated they would speak in the morning and determine the location and time then.

72.     On or about October 22, 2020, at approximately 10:56 a.m., UC2 received a telephone call from MONEY COURIER 6.  UC2 and MONEY COURIER 6 agreed to meet at the mall at noon. At approximately 12:00 p.m., MONEY COURIER 6 and three other individuals arrived at the mall. MONEY COURIER 6 exited the front passenger seat of the vehicle with a bag and then walked to the front passenger seat of the undercover vehicle.  MONEY COURIER 6 opened the front passenger door and placed a bag inside and then walked back the front passenger seat of his vehicle.

The vehicle then drove away. UC2 opened the bag and observed U.S. currency, that was subsequently found to total approximately $170,297.

73. Later that day at approximately 3:41 p.m. SALINAS SALCEDO sent wiring instructions to UC1.

74. On or about October 23, 2020, at approximately 11:45 a.m., UC2 placed a call to MONEY COURIER 5. UC2 explained he/she was calling because he/she was looking for "work" [narcotics]. MONEY COURIER 5 stated he would ask his boss for permission. UC2 stated he/she was "very dry" [no narcotics] at the moment, and that he/she managed both sides [money and narcotics]. UC2 added that he/she keeps being told "it's coming" [narcotics] but that nothing arrived. MONEY COURIER 5 laughed and said they've had the same problem. MONEY COURIER 5 explained that as long as he had permission it would be fine.

75. On or about October 27, 2020, at approximately 1:16 p.m., SALINAS SALCEDO texted UC1 "What's going on? [UC2's] people are calling my client again. What's that about? Pay them an adjustment now, this is the second time now. He's being a turncoat bro. Help me out with that please. That's twice now, the last time with Chalan and now this." At approximately 1:37 p.m., SALINAS SALCEDO texted UC1, "He's asking for work. From that number. That is bullshit." At approximately 3:59 p.m., SALINAS SALCEDO wrote, "Bro, I'm not your client JO, or talk smack, I don't even make threats about who I am or anything. I can only tell you they are serious people, I am asking to please check it out please. But, make an adjustment for [UC2] because it's the second time now."

76.    On or about October 28, 2020, at approximately 9:54 a.m., UC1 informed SALINAS SALCEDO that he/she had spoken with [UC2] and that "[UC2] is one hundred percent trustworthy. That being said, I know for a fact that they are running low on avocados [narcotics] there in Chicago" and SALINAS SALCEDO replied "Yes, bro because the problem is it seems to me that they already took my work and it's the second time this happens now." At approximately 10:02 a.m., after some additional discussion between UC1 and SALINAS SALCEDO regarding UC2's call on October 23, 2020, SALINAS SALCEDO wrote "whether they are the cops or rats, I will obviously have your back but the issue is that this is not the first time it's happened and so that makes them feel nervous and pissed off with me."

## CONCLUSION

77.    Based on the above information, I respectfully submit there is probable cause to believe that beginning no later than in or about April 2019 and continuing until at least on or about October 28, 2020, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant MIGUEL SALINAS SALCEDO, also known as "JORGE SALAS," conspired to commit offenses in violation of Title 18, United States Code, Section 1956, that is to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is the felonious buying and selling and otherwise dealing in a controlled substance, knowing that the transaction was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control, of the proceeds of said specified unlawful activity and that

while conducting and attempting to conduct such financial transaction knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

FURTHER AFFIANT SAYETH NOT.

CAROLYN WORKING
Special Agent, Internal Revenue Service

SWORN TO AND AFFIRMED by telephone September 22, 2021.

Honorable YOUNG B. KIM
United States Magistrate Judge